**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-306 (JMC)** |
| **v.** | : | |
| | : | |
| **WILLIAM STEPHON KIT,** | : | |
| | : | |
| **Defendant** | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.

Defendant William Stephon Kit was anything but a passive observer during the attack on the United States Capitol on Jan. 6, 2021. Multiple times that day, Kit pushed to the front of the crowd of rioters and livestreamed the violent rhetoric he yelled at the outnumbered police officers:

- *"There is a fucking price to pay for freedom."*

- *"Are you willing to pay the price?"*

- *"Are you willing to fucking die for this shit?"*

- *"We are here to die for this shit today."*

And Kit continued to livestream his activities as he breached the Capitol building on January 6 and yelled, "Where are those goddman politicians at? [We're] taking over the god damn Capitol."

Those statements amplified those he had been posting for months during the leadup to January 6 on his popular YouTube and Instagram accounts, where he promoted theories of election fraud to tens of thousands of subscribers.

1

For the reasons set forth herein, the government requests that the Court sentence Defendant William Stephon Kit to 90 days of incarceration, 24 months of probation, 60 hours of community service, and $500 in restitution.

## I.       Introduction

Defendant William Stephon Kit, a 46-year-old social media influencer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Kit pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) for his conduct at the Capitol on Jan. 6, 2021 and one count of violating 22 D.C. Code §§ 4504(a) and 1803 for his unlawful possession of an unlicensed firearm when later arrested for his conduct on Jan. 6. As explained herein, a sentence of incarceration followed by a lengthy sentence of probation is appropriate here because Kit (1) promoted conspiracy theories on his popular social media channels that the 2020 election was stolen in the leadup to January 6, 2021; (2) badgered officers defending the Capitol with violent, threatening language; (3) livestreamed his brazen, enthusiastic conduct to his thousands of followers; (4) fled from FBI agents who were executing a warrant for his arrest for his January 6 conduct; (5) discarded an unlicensed Barretta nine millimeter pistol that had been stolen from a firearms store in Maryland during his flight from FBI agents; and (6) has

---

[1] Although the Statement of Offense in this matter, filed on Dec. 13, 2022, (ECF No. 22 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

demonstrated zero remorse in his many social media videos since Jan. 6, 2021, which have minimized his conduct and the conduct of the rioters as a whole that day.

The Court must also consider that Kit's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Kit's crime support a sentence of 90 days of incarceration and two years of probation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1–7.

### *Kit's Conduct before Jan. 6, 2021*

Kit operates popular accounts on YouTube (approximately 37,000 followers) and Instagram (approximately 78,000 followers) under the moniker "Semore Views." In the leadup to the 2020 presidential election, Kit posted several videos claiming that Democrats would attempt to steal the election from President Donald Trump. *E.g.* Ex. 1 (Oct. 25, 2020 Kit Livestream) at timestamp 3:25. And after the election and before January 6, Kit posted that the election had indeed been stolen from President Trump and that President-elect Joe Biden must be prevented from assuming the Presidency. For example, on November 11, 2020, Kit posted a later-removed livestream titled "Post Election Comments" in which he repeatedly claimed that the election had been rigged against President Trump and that "we need to fucking step it up to have President Trump's back." Ex. 2 (Excerpt of Nov. 11, 2020 Kit Livestream). He said, "Trump is fighting, and I'm fighting until he stops fighting." *Id*. These statements, before January 6, 2021, are First-

Amendment protected statements, but nevertheless highlight his intent when he committed the crime itself. Moreover, the dangers of promulgating violent or misleading rhetoric to thousands of others, in the context of January 6, help to inform this Court of the appropriate sentence.

*Defendant Kit's Role in the January 6, 2021 Attack on the Capitol*

On the morning of Jan. 6, 2021, Kit livestreamed himself stating that he was preparing to travel to the U.S. Capitol where members of Congress were certifying the election. He said that President Trump was fighting "evil motherfuckers" and that a lot of "sneaky shit" and "tricks" were pulled to make Joe Biden president. Kit said he was going to the Capitol to fight, take action, and "stop the steal." Ex. 3 (Jan. 6, 2021 Kit Livestream 1) at timestamp 3:00.

Kit then livestreamed himself traveling by car to the Ellipse in time for then-President Trump's "Save America" speech, which began at 12 p.m. Ex. 4 (Jan. 6, 2021 Kit Livestream 2). Kit livestreamed during the speech, in which then President Trump detailed his claims of election fraud and encouraged supporters to walk to the U.S. Capitol, where Congress was preparing to certify the 2020 Electoral College results. Ex. 5 (Jan. 6, 2021 Kit Livestream 3).

Kit then walked to U.S. Capitol grounds and entered onto the West Plaza area. At 1:15 p.m., Kit approached a defensive line of metal bike racks defended by police officers, who were fighting to block the swelling crowd of rioters from further approaching the Capitol building. Kit walked to the very front of the crowd of rioters who were confronting the line of police officers. At times, Kit yelled at the crowd to "relax." But he also shouted angrily at the officers when they told members of the crowd to back away from the police line. Ex. 6 (MPD body-worn camera footage) at 1:17 p.m. (timestamp 0:58).

Metropolitan Police Department body worn camera footage during this period shows Kit, wearing a green camouflage jacket, white head covering, and a red shirt that reads "I am Semore

Views." Image I below shows Kit raising his middle finger toward the Capitol as he yelled, "Fuck you Nancy Pelosi!"



Image 1

*Kit on the West Plaza raising his middle finger toward the Capitol. Ex. 6 (MPD body-worn camera footage) at 1:17 p.m. (timestamp 5:01).*

At 1:20 p.m., individuals in the West Plaza crowd near Kit began pushing against the bike rack barricade and fighting officers. Ex. 6 (MPD body-worn camera footage) (timestamp 7:41). As police sought to regain control, they deployed OC spray toward Kit and others. This caused Kit to momentarily step away from the police line. As shown in Image 2, below, he then returned to the front of the crowd seconds later and became more aggressive in yelling and gesturing toward police officers.



<u>Image 2</u>
*Kit yelling at police officers on the West Plaza. Ex. 6 at 1:20 p.m. (timestamp 7:53).*

At 1:30 p.m., Kit moved north along the West Plaza before moving again toward the front of the crowd where rioters violently clashed with police officers. Image 3, below, a screen shot of closed-circuit video ("CCV") on the West Plaza, shows Kit's proximity to police as they deployed crowd-control munitions against the increasingly hostile crowd.



<u>Image 3</u>
*Police deploy crowd control munitions against the West Plaza crowd. Kit circled in Red. Ex. 7 (West Plaza CCV) at 1:33 p.m. (timestamp 3:15).*

Kit then moved back to the south (the left side of Image 3), where he again angrily confronted police officers fighting to quell the crowd. *See* Image 4, below. Open-source video shows Kit at 1:42 p.m.[2] being sprayed by police officers with a chemical irritant as he yelled at officers and pointed angrily in their faces.

---

[2] The timing of this video is corroborated by CCV video showing the West Plaza. Ex. 8 (West Plaza CCV) at 1:42 p.m. (timestamp 2:30).



<u>Image 4</u>
*Kit yelling and pointing at officers on the West Plaza.* Ex. 9 *(third-party video – "Hold the Line") at timestamp 3:45.*

In the weeks before January 6, an inauguration seating gallery with covered scaffolding was constructed on top of the Northwest Staircase, which led from the West Plaza up to the second floor of the Capitol building. At 1:48 p.m., rioters overpowered a small line of officers defending the base of this staircase and poured into the scaffolding. In response, police officers and rioters alike on the West Plaza moved toward this scaffolding, and Kit followed the crowd. *See* Image 5, below.



<u>Image 5</u>

*Kit moving toward scaffolding over the Northwest Stairs minutes after its entry point was breached by other rioters. Kit circled in red; scaffolding over Northwest Stairs marked by yellow arrow. Ex. 10 (northern West Plaza CCV) at 1:51 p.m. (timestamp 0:50).*

Less than ten minutes after the Northwest Stairs were breached, Kit climbed onto a small portion of the staircase not covered by the inauguration scaffolding. Image 6, below, shows Kit as he pumped his fists in the air and waved others along to join him.



<u>Image 6</u>

9

*Kit on Northwest Stairs next to scaffolding. Ex. 11 (Lower Northwest Stairs CCV) at 1:59 p.m. (timestamp 0:01).*

As shown in Image 6, police officers had by this time fallen back to form a defensive line midway up the Northwest Stairs where the scaffolding ended. Rioters overran this line at 2:09 p.m. and continued up the Northwest Stairs to the Upper West Terrace, which provided access to several entrances on the Capitol's second floor. *Ex. 11 (Lower Northwest Stairs CCV) at 2:09 p.m. (timestamp 9:00)*. Kit followed just three minutes behind the front of the crowd. *See* Image 7, below.



Image 7

*Kit ascending the Northwest Stairs. Ex. 11 (Lower Northwest Stairs CCV) at 2:12 p.m. (timestamp 12:00).*

After climbing the Northwest Stairs, Kit walked back down them at 2:20 p.m. to livestream himself speaking as the crowd passed around him. *See* Image 8, below; *see* Ex. 13 at 2:20 p.m. (showing Kit livestreaming). Kit celebrated the success of rioters overtaking the Capitol's defenses, stating, "This is our Capitol," "They will not steal our fucking fair election," and "We're taking back over the fucking House." Ex. 12 (Kit Jan. 6, 2021 Livestream 4).



<u>Image 8</u>
*Kit livestreaming on the Northwest Stairs. Ex. 12.*

Kit then moved to the Northwest Terrace adjacent to the Senate Wing Door, which rioters first breached at 2:13 p.m.—the building went into lockdown minutes later. Ex. 14 (Jan. 6, 2021 Kit Livestream 5). Kit remained on the Northwest terrace for approximately 30 minutes, where he saw police officers in body armor and face shields attempt to secure the outside of the building. Kit livestreamed himself aggressively yelling at the officers, "Are you willing to fucking die for this shit? We are here to die for this shit today. There's a fucking price to pay for freedom. Are you willing to pay the fucking price?" Ex. 15 (Jan. 6, 2021 Kit Livestream 6) (timestamp 0:35). He also recorded himself encouraging other rioters to stand strong against police, yelling at those around him to "hold the fucking line." *Id.* (timestamp 0:15).

At approximately 2:57 p.m., Kit entered the Capitol building through the Senate Wing Door. *See* Image 9, below. Upon entering, Kit yelled, "Where are those goddamn politicians at? [We're] taking over the goddamn Capitol." Dkt. 22 at 4 (Statement of Offense). CCV inside this area of the Capitol building captures Kit livestreaming on his phone as he walks into the building.



<u>Image 9</u>
*Kit entering through the Senate Wing Door area at 2:57 p.m. Ex. 16 (Senate Wing Door CCV)*
*(timestamp 1:40).*

After walking through the doorway pumping his fist in the air, Kit turned south and walked

toward the Crypt before returning to the Senate Wing Door entryway. Ex. 16. He looked down the

hallway to the north of the entryway, then climbed out a broken window adjacent to the Senate

Wing Door at 3:01 p.m. *See* Image 10, below.



<u>Image 10</u>
*Kit climbing through a broken window adjacent to the Senate Wing Door. Ex. 16 (Senate Wing*
*Door CCV) at 3:01 p.m. (timestamp 4:35).*

*Kit's Conduct After January 6, 2021*

Kit showed no remorse for his participation in the breach of the Capitol. The next day, Kit posted a video on YouTube titled "Where were you president trump," in which he criticized President Trump for condemning the rioters' actions at the Capitol and for not joining himself. Ex. 17 (Jan. 7, 2021 Kit Livestream).

On May 24, 2021, Kit admitted he was at the Capitol on Jan. 6, 2021 during a recording of his conversation with an unknown person. He said the media had mischaracterized the events to hide police violence and portray rioters in a falsely negative light. "I was at the Capitol, some of the police got out of order. You've got to understand, they make order out of chaos … they didn't show you the police throwing percussion bombs into peaceful protestors." Ex. 18 (May 24, 2021 Instagram video) (timestamp 0:35).

On January 7, 2022, approximately one year after the Capitol breach, Kit posted a video titled "Jan 6 witness talks about insurrection." He said that the only "real insurrection" that had occurred were the 2020 protests that followed the death of George Floyd. Ex. 19 (Jan. 7, 2022 Instagram livestream). Kit said, "Y'all need to leave this January 6 stuff alone. Stop believing the hype."

On August 18, 2022, Kit posted an Aug. 2, 2022 Daily Beast article about his arrest to his Instagram account. Ex. 20. He wrote "#FreeSemoreViews" over a screenshot of the article.

*Kit's Arrest*

On July 29, 2022, agents with the Federal Bureau of Investigation arrived at Kit's home in Washington, D.C. to execute a warrant for his arrest in relation to his conduct on Jan. 6, 2021. The agents approached Kit after he left his home, and Kit responded by fleeing on foot. As Kit fled

from agents, he removed a handgun from his waistband and threw it to the ground. FBI agents apprehended Kit and recovered the handgun.

This handgun was an unregistered Berretta APX, nine-millimeter pistol with the serial number A056743X, loaded with 13 rounds of ammunition. Agents verified that it had been stolen from a firearms dealer in Maryland. Kit told FBI agents that he purchased it with cash from an individual at his job and that he carried it for self-defense.

*Kit's Post-Jan. 6 Statements to FBI Agents*

Kit was first interviewed by FBI agents on January 8, 2021 regarding his activity at the Capitol two days prior. Although he admitted to going inside the Capitol building, he minimized his conduct and blamed his actions on the police. Kit stated that he had become trapped in the crowd and was swept up in its movement into the building, and that the crowd had been driven inside the building by police officers' use of tear gas and flash grenades. Kit also posted a livestream on January 8, 2021, just after officers finished speaking with him, according to Kit. Kit repeated his claim that police provoked the crowd and that he only went inside the Capitol building because police officers were using crowd control munitions and he "had no other place to go." Ex. 21 (Jan. 8, 2021 Kit Livestream) (timestamp 2:00)

After his arrest in relation to this case, Kit was interviewed again by FBI agents on July 29, 2022. Kit admitted to having a firearm on his person when agents attempted to arrest him. He said he had purchased the weapon at the convenience store where he worked at the time. Kit also admitted to being inside the Capitol and identified himself in photos inside the Capitol and from his social media accounts.

14

*The Charges and Plea Agreement*

On July 28, 2022, the United States charged Kit by criminal complaint in U.S. District Court with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). ECF No. 1. As noted above, FBI agents arrested Kit outside his home in Washington, D.C. on August 1, 2022.[3] On September 13, 2022, the United States charged Kit by a four-count Information with the same four offenses. On December 5, 2022, the United States filed a two-count Superseding Information charging Kit with violations of 18 U.S.C. § 1752(a)(1) and 22 D.C. Code §§ 4504(a) and 1803. On December 13, 2022, pursuant to a plea agreement, Kit pleaded guilty to Counts One and Two of the Superseding Information. In that plea agreement, Kit agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Kit now faces a sentencing on Count One: Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) and Count Two: Attempted Carrying a Pistol Without a License (Outside Home or Place of Business) in violation of 22 D.C. Code §§ 4504(a) and 1803. As noted by the plea agreement and the U.S. Probation Office, for Count One, Kit faces up to one year of imprisonment, a fine of $100,000, and a term of supervised release of not more than one year. For Count Two, Kit faces up to 180 days of imprisonment and a fine of $1,000. Kit must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

---

[3] Following Kit's arrest, he was also charged separately in D.C. Superior Court with firearms-related offenses.

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation in the PSR as to Count One, charging 18 U.S.C. 1752(a)(1). However, the government concurred with Kit's objections to the draft PSR with respect to Count Two. ECF No. 24 (Def. PSR Objections); ECF No. 25 (Gov. PSR Objections). In particular, the PSR classified Count Two—which charges Kit with Attempted Carrying a Pistol Without a License in violation of 22 D.C. Code §§ 4504(a) and 1803—as a felony offense carrying a maximum penalty of five years of incarceration and a maximum fine of $12,500. However, those are the penalties for Carrying a Pistol Without a License ("CPWL"), rather than attempted CPWL, which is a misdemeanor offense carrying a maximum penalty of 180 days of incarceration or a $1,000 fine. *See* 22 D.C. Code § 1803. Relatedly, the Government also concurred with Kit's objection to the draft PSR's conclusion that the District of Columbia's Voluntary Sentencing Guidelines apply to Count Two of the Superseding Information. Because the D.C. guidelines only apply to misdemeanor offenses, they do not apply to Count Two. *See* 2022 D.C. Voluntary Sentencing Guidelines Manual at 5 (providing that the D.C. guidelines apply only to felonies).

As to Count One, the U.S. Probation Office calculated Kit's offense level under the Sentencing Guidelines as follows:

Base Offense Level (U.S.S.G. §2B2.3(a))                          +4
Specific Offense Characteristics (U.S.S.G.

16

| | |
|---|---|
| §2B2.3(b)(1)(A) | +2 |
| §3C1.2 | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **6** |

*See* PSR at ¶¶ 30–39.

The U.S. Probation Office calculated Kit's criminal history as a category I. PSR at ¶ 44. Accordingly, the U.S. Probation Office calculated Kit's total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶ 78. Kit's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation with respect to Count One.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a 90-day term of incarceration and a two-year term of probation. Specifically, the Court should sentence Kit to two years of probation, 60 hours of community service, and $500 in restitution for his violation of 18 U.S.C. § 1752(a)(1) (Count One of the Superseding Information) and 90 days of incarceration for his violation of 22 D.C. Code §§ 4504(a) and 1803 (Count Two).[4]

### A.  The Nature and Circumstances of the Offenses

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kit's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kit, the absence of violent or destructive acts is not a mitigating factor. Had Kit engaged in such conduct, he or she would have faced additional criminal charges.

One of the most pertinent aspects of Kit's conduct was his extreme rhetoric on social media and in person at the Capitol. In the leadup to January 6, not only did Kit spread false claims about the election being stolen to tens and thousands of followers, he encouraged them to "fight" in

---

[4] As 22 D.C. Code §§ 4504(a) and 1803 is a Class B misdemeanor and thus a petty offense, the Court may impose a term of incarceration for Kit's conviction under Count Two of the Superseding Information followed by a term of probation for Kit's conviction of Count One, which charged 18 U.S.C. § 1752(a)(1), a Class A misdemeanor. *See United States v. Terry Lindsey*, Criminal Case No. 21-cr-162, ECF No. 102 (Howell, C.J.) (sentencing defendant to five months of incarceration for two petty offense convictions and three years of probation for 18 U.S.C. § 1752(a)(1) conviction).

support of President Trump. On January 6, Kit may not have physically assaulted officers, but he nevertheless enthusiastically incited the crowd and badgered officers at moments in the day where tensions between rioters and police were at their peak.

Kit's own actions were highly disruptive as well. Kit time and again placed himself as close as he could get to the front of the crowd of rioters as they squared off with police officers. He was also part of the crowd's initial surge up the Northwest Stairs to the Senate Wing Door, which led to the Congressional proceedings being driven to a halt after rioters breached the building at 2:13 p.m.

Finally, Kit's offense conduct in this case includes his unlawful possession of an unregistered handgun that was discovered only after his flight from FBI agents seeking to arrest him for his crimes on January 6. Plainly, fleeing from law enforcement officers while in possession of a firearm creates a substantial risk of harm.

Accordingly, the nature and the circumstances of this offense establish the clear need for both incarceration and probation in this matter.

### B. Kit's History and Characteristics of Kit

As "Semore Views," Kit has posted regularly about politics, as is his right, with most videos featuring monologues and arguments recorded at a convenience store where he was formerly employed. However, some videos on Kit's channels are more confrontational and aggressive in nature, where Kit films himself in public berating or harassing those with differing political views. *E.g.* Ex. 22 (June 25, 2022 Kit Livestream); Ex. 23 (May 14, 2021 Kit Livestream).

Kit has also indicated that he would not hesitate to respond violently in defending his political views. On May 14, 2021, Kit stated in a livestream:

> I say what the fuck I want to say in the hood cause I'm a fucking gun carrying fucking Republican, badass in the fucking hood and anybody fucking walk up on

Semore Views in the fucking hood cause you don't like what I say, you gone get smoked by a motherfuckin' youtuber and that's on God, bitch.

Ex. 23 at timestamp 6:20. Kit was charged with minor traffic and drug paraphernalia crimes between the ages of 15 and 20. None of those convictions resulted in criminal history points under the Sentencing Guidelines calculation. Dkt. 23 (Draft Presentence Investigation Report) at 10–13.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Kit's statements after January 6 demonstrate a need for specific deterrence here. As described in more detail above, in the aftermath of the Capitol riot, Kit continued to minimize his own conduct and the conduct of the crowd generally. He placed blame on the police for their response to the rioters and deflected culpability by saying the "real insurrection" was the series of protests that took place nationwide after the death of George Floyd. Kit may have accepted responsibility for his criminal conduct, but his words and actions since January 6 indicate he has little remorse for his actions that day.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Kit based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Kit has pled guilty to Count One of the Superseding Information, charging him with Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. Kit also pled guilty to Count Two of the Superseding Information, charging him with Attempted Carrying a Pistol Without a License (Outside Home or Place of Business) in violation of 22 D.C. Code §§ 4504(a) and 1803. As this is a misdemeanor violation of the D.C. criminal code, neither the United States or the D.C. sentencing guidelines apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

One point of comparison is *U.S. v. Billy Knutson*, Criminal Case No. 22-cr-31, who Judge Florence Pan sentenced to six months of incarceration and one year of supervised release for violating 18 U.S.C. § 1752 (a)(1). Like Kit, Knutson was active on social media in the leadup to January 6, not only posting extreme rhetoric but encouraging others to join him in taking action. And although Knutson, like Kit, was only in the building for a matter of minutes, he also attempted to incite others in the crowd through inflammatory statements. Like Kit, Knutson continued to post on social media after January 6 in a manner that made clear he felt little remorse. But Kit's conduct was in several respects more serious than Knutson's. While both men did not commit physical violence, Kit moved across nearly the entire police line on the West Plaza badgering officers and inciting the crowd. And Kit's rhetoric—yelled into the faces of outnumbered police—was particularly hostile and threatening.

Kit's conduct is also comparable to that of *Sam Fisher*, Criminal Case No. 21-cr-142, who Judge Carl Nichols sentenced to three months of incarceration and one year of supervised release. Like Kit and Knutson, Fisher was also a frequent and popular poster on social media in encouraging others to "fight" in response to allegations of election fraud. Like Kit, Fisher continued to post on social media after January 6 in celebrating the conduct of rioters at the Capitol. Judge Nichols also considered that Fisher brought firearms to the D.C. area (though not within the district) on January 6, 2021, but did not carry them with him to the Capitol that day. Kit's violent rhetoric about being a "gun carrying Republican" eager to engage in conflict with those who disagreed with his views is a fairly distinct and aggravating feature of this case.

Finally, Kit's conduct is comparable to that of *Adam Honeycutt*, Criminal Case No. 22-cr-50, who Judge Nichols sentenced to 90 days of incarceration, to run consecutively to firearms convictions for which Honeycutt had been incarcerated when sentenced in the January 6 case. Like Kit, Honeycutt witnessed the violence that occurred outside the Capitol building before entering. Like Kit, Honeycutt celebrated the events of January 6 on social media as the riot occurred and afterward. And like Kit, Honeycutt repeatedly badgered the badly outnumbered police officers trying to defend the Capitol. However, Kit's conduct was far more sustained, and his social media content has been much more prolific.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to Kit to 90 days of incarceration, two years of probation, 60 hours of community service, and $500 in restitution. Such

a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Hutton Marshall*
J. HUTTON MARSHALL
Assistant U.S. Attorney
DC Bar No. 1721890
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov

JASON M. MANNING
NY Bar No. 4578068
Trial Attorney, Detailee
1400 New York Ave NW, 11th Floor
Washington, D.C. 20005
(202) 514-6256
jason.manning@usdoj.gov